**UNITED STATES DISTRICT COURT**giu
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------X

DEBRA M. CABIBI,

               Plaintiff,

         -against-

CAROLYN W. COLVIN, as
COMMISSIONER OF SOCIAL SECURITY

             Defendant.

--------------------------------------------------------X

**FILED**
**CLERK**
8/28/2014 3:10 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF
DECISION AND ORDER**
12-CV-4669

<u>**APPEARANCES:**</u>

**Law Office of Sharmine Persaud**
*Attorneys for the Plaintiff*
11-05 Route 110
Farmingdale, NY 11735
     By: Sharmine Persaud, Esq., Of Counsel

**Loretta E. Lynch**
United States Attorney
Eastern District of New York
*Attorneys for the Defendant*
610 Federal Plaza
Central Islip, New York 11722
     By: Vincent Lipari, Assistant United States Attorney

**SPATT, District Judge**.

     On September 19, 2012, the Plaintiff Debra M. Cabibi (the "Plaintiff") commenced this action pursuant to the Social Security Act 42 U.S.C. § 405(g) (the "Act"), challenging a final determination by the Defendant Carolyn W. Colvin, as Commissioner of Social Security (the "Commissioner" or the "Defendant"), that she was ineligible for Social Security disability benefits.  Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c).  Also before the Court is the Plaintiff's cross-motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

The Court notes that both party's motion papers contain footnotes in violation of the Court's Individual Rules. Nevertheless, despite these infractions, the Court will consider both motions.

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied and the Plaintiff's cross-motion for judgment on the pleadings is granted, but only to the extent that the Court finds that remand is appropriate in this case.

## I. BACKGROUND

### A. Procedural History

On January 28, 2005, the Plaintiff filed an application for a period of Disability and Insurance Benefits. (Administrative Record ("AR") at 95.) Due to her lupus, fibromyalgia and breast cancer, she alleged a disability and inability to work since January 8, 2004. (Administrative Record ("AR") at 95.) On July 15, 2005, the Social Security Administration ("SSA") denied her application. (AR at 23–25, 27.) Thereafter, the Plaintiff made a timely request for a hearing before an Administrative Law Judge ("ALJ"). (AR at 23–25, 27.)

On July 31, 2007, the Plaintiff testified at a hearing held before ALJ Andrew S. Weiss. (AR at 384–407.) She was represented by counsel at the hearing. (AR at 384–407.) Following the hearing and a review of the record, in a decision dated August 31, 2007, ALJ Weiss found that the Plaintiff was not disabled and denied the Plaintiff's claim for disability benefits. (AR at 35–44.)

On September 14, 2007, the Plaintiff requested that the Appeals Council review ALJ Weiss's August 31, 2007 decision. (AR at 45–46, 49–61.) On May 30, 2008, the Appeals Council remanded the Plaintiff's case for further proceedings. (AR at 62–65.) In this regard, the Appeals Council explained that "further development [was] necessary," and therefore instructed

the ALJ on remand to (1) give further consideration to the opinion of the Plaintiff's treating physician, Dr. Peter M. Rumore, (2) obtain additional evidence cornering the Plaintiff's orthopedic impairment, (3) give further consideration to the Plaintiff's maximum residual function capacity ("RFC"), and (4) if warranted, obtain evidence from a vocational expert ("VE") to clarify the effect of the assessed limitations on the Plaintiff's occupational base. (AR at 62–65.)

On February 24, 2009, ALJ Weiss held a second hearing. The Plaintiff, who was again represented by counsel, testified. (AR at 45–83.) A VE and a medical expert also testified. (AR at 45–83.) On March 26, 2009, ALJ Weiss issued a partially favorable decision for the Plaintiff. (AR at 69–81.) In this regard, he found that the Plaintiff was disabled beginning on July 5, 2007, but was not disabled prior to this date as the Plaintiff alleged. (AR at 69–81.)

On April 19, 2009, the Plaintiff requested that the Appeals Council review ALJ Weiss's March 26, 2009 decision with respect to the date of the onset of her disability, which she was maintained was January 8, 2004, and not July 5, 2007, as ALJ Weiss had found. (AR at 82–83.) On June 14, 2011, the Appeals Council once again remanded the Plaintiff's case for further proceedings. (AR at 90–93.) Specifically, the Appeals Council instructed the ALJ on remand to (1) give further consideration to Dr. Rumore, as a treating source opinion; (2) give further consideration to the Plaintiff's maximum RFC and provide appropriate rationale including directly citing evidence included in the record; and (3) if warranted by the expanded record, obtain additional evidence from a VE so as to clarify the Plaintiff's occupational base in light of her assessed limitations. (AR at 92.)

On September 22, 2011, ALJ Jay L. Cohen held a hearing to determine whether was disabled from January 8, 2004 through July 4, 2007. (AR at 309–44.) Still represented by

counsel, the Plaintiff testified, as did a VE. (AR at 309–44.) After the hearing and a review of the record, on January 12, 2012, ALJ Cohen issued a decision finding that the Plaintiff was not disabled during the period of January 8, 2004 through July 4, 2007. (AR at 309–44, 8–17.)

On February 8, 2012, the Plaintiff requested review by the Appeals Council of ALJ Cohen's January 12, 2012 decision concerning the onset date of her disability. (AR at 6–7.) However, on August 2, 2012, the Appeals Council denied the Plaintiff's request, thereby making the January 12, 2012 decision the final decision of the Commissioner in the Plaintiff's case. (AR at 3–5.) On or about September 9, 2012, the Plaintiff commenced the present appeal from that decision.

**B. The Administrative Record**

### 1. The Plaintiff's Non-Medical Background

The Plaintiff was born on December 19, 1955 and is fifty-nine years of age. (AR at 112, 349.) She completed high school and attended college for two years, receiving an associates degree in business administration in 1976. (AR at 101, 350, 96.)

From 1994 to January 2004 the Plaintiff was employed as an office manager at Sterling Optical. (AR at 96, 104–05, 124–25.) Her work history only goes back ten years, because prior to that date the Plaintiff was raising her children. (AR at 124.) The Plaintiff stopped working in January of 2004, after pain and fatigue allegedly caused her to cut her hours back to three days a week, then two days, and finally one day before she was totally unable to continue working. (AR at 390.)

The Plaintiff is divorced and lives with her father and three children, who at the time of the alleged onset date were twelve, thirteen, and seventeen years old. (AR at 395.) On a typical day, she stays in bed until noon and performs household tasks and shopping with help from her

family.  (AR at 327–28.)  She makes the easiest meals possible due to the fact that she cannot stand for very long.  (AR at 134, 327.)  In addition, the Plaintiff's children assist her with the cleaning of the house, as well as carry the laundry and the bags during shopping trips.  (AR at 328.)  For entertainment, she watches television, reads and does crossword puzzles, all of which she does daily.  (AR at 328–29.)  The Plaintiff spends her time resting rather than socializing with friends, and has allegedly been unable to pursue her interests in walking and yoga due to her condition.  (AR at 133, 136.)  However, the Plaintiff does go to church twice a week.  (AR at 137.)

### 2.   The Medical Evidence

The Plaintiff's medical issues began in May of 1997, when she was diagnosed with "breast carcinoma, Stage I."  (AR at 161–64.)  Beginning in 2003, after she was treated for the breast cancer, the Plaintiff began treatment at Rheumatology Associates "primarily for fibromyalgia, lupus, degenerative joint disease, low back pain, knee pain, and gastroesophogeal reflux disease."  (Pl. Mem., pg. 4.; AR at 171–246.)

On March 20, 2003, the Plaintiff visited Rheumatology Associates and was examined by one of the doctors in the practice, Dr. M. Barilla-LaBarca.  (AR at 232–33.)  According to Dr. LaBarca, the Plaintiff presented with a rash on her face, which was biopsied and came out as lupus.  (AR at 232.)  Further, Dr. LaBarca noted the Plaintiff's "prominent photosensitivity, polyartharalgias, and arthritis involving her knees, hips and hands, morning stiffness that last[s] about one hour, [ ] fatigue," and Sicca, or dryness, symptoms related to the Plaintiff's dry mouth and dry eyes.  (AR at 232.)

During her physical examination of the Plaintiff, Dr. LaBarca observed that the Plaintiff had (1) "erythematous, palpable, dime to quarter size lesions over her arms and back, the right

was greater than her left"; (2) left hip pain 1+ on external rotation; and (3) 1+ pain and 2+ swelling over her metacarpophalangeal ("MCP") joints two and three bilaterally.  (AR at 233–37.)  Dr. LaBarca reviewed previous tests performed on the Plaintiff, which revealed (1) degenerative changes in the Plaintiff's left hip; (2)  reduced disk space at L5-S1 in the Plaintiff's lumbar spine; and (3)  mild degenerative joint disease of the Plaintiff's cervical spine. (AR at 233–37.)  Sometime thereafter, Dr. LaBarca apparently left Rheumatology Associate's practice.  (AR at 224–229.)

On April 5, 2003, Dr. Jeffery L. Lieberman of BAM Radiology performed an MRI of the Plaintiff's left hip.  (AR at 169.)  In a letter dated April 9, 2003, he advised Dr. Labarca that "[t]here [was] no evidence of an occult fracture or definite bone marrow replacement (such as neoplastic disease) seen in the left hip."  (AR at 169.)  However, he noted that "[t]here [was] a small amount of fluid seen by the left hip, in particular anterior to the femoral neck and by the femoral head," which "[did] not appear to extend into the femoral/acetabular component of the hip."  (AR at 169.)  According to Dr. Lieberman, "[t]he fluid [was] more prominent on the left than on the right."  (AR at 169.)  He opined that "[t]his [ ] [was] [ ] somewhat unlikely to represent bursitis, as [it] [did] not extend into the acetabular/femoral component of the hip," though he felt "this possibility does remain a consideration."  (AR at 169.)

On July 22, 2003, the Plaintiff visited Hematology Oncology Associates of Western Suffolk, PC, and was examined by Dr. Paul M. Hyman.  (AR at 163–64.)  Dr. Hyman indicated that the Plaintiff had "breast carcinoma, Stage I dating from May 1997" and noted she was taking "Plaquenil and Celebrex for underlying [systemic lupus erythematosus ("SLE")] and rheumatoid arthritis from which she was doing quite well."  (AR at 163.)

On July 16, 2003, the Plaintiff returned to Rheumatology Associates for another visit, but this time she was examined by Dr. Nazia Hussain, who was another doctor in the practice. (AR at 226–230, 232.) Dr. Hussain noted the Plaintiff's complaint of both tumid lupus and of "low back pain radiating to her buttocks, and swelling and arthralgias in the hands." (Pl. Mem., pg. 4.; AR at 226–27.)

On September 10, 2003, the Plaintiff had another physical examination at the offices of Rheumatology Associates. The Court notes that while no doctor signed or initialed the bottom of the report concerning this Plaintiff's September 10, 2003 examination, Dr. Hussain's name appears at the top of the report and the handwriting on the report matches the handwriting used by Dr. Hussain in filling out other reports and paperwork related to the Plaintiff's case. (AR at 224–29, See AR at 216, 215, 209, 194, 193, 192, 176, 171.) Therefore, the Court assumes that the Plaintiff's September 10, 2003 visit was with Dr. Hussain and that Dr. Hussain completed the associated report.

During the September 10, 2003 examination, the Plaintiff complained of pain in her left knee. (AR at 224.) Dr. Hussain diagnosed the Plaintiff with abdominal pain, tumid lupus and fibromyalgia. (AR at 224.) In addition, Dr. Hussain found that the Plaintiff had crepitus in the knee, decreased range of motion in both hips and fibromyalgia tender points on examination. (AR at 224.)

On October 22, 2003, the Plaintiff again had an office visit with Dr. Hussain, during which she complained of achy knees. (AR at 216.) Dr. Hussain diagnosed the Plaintiff as having tumid lupus and degenerative joint disease of the knees. Thereafter, in her notes concerning an examination of the Plaintiff that occurred on December 19, 2003, Dr. Hussain also diagnosed the Plaintiff with osteoarthritis of the left knee in addition to diagnoses of tumid lupus

and fibromyalgia. (AR at 215, 224.) Dr. Hussain based this diagnosis on x-rays that had been taken of the Plaintiff's left knee. (AR at 215, 224.)

As of February 17, 2004, according to Dr. John J. Loscalzo of Hematology Oncology Associates of Western Suffolk, PC, the Plaintiff "did not have any evidence of an active malignancy and would not be considered disabled from an oncological standpoint." (AR at 162.)

On March 12, 2004, the Plaintiff was once more examined by Dr. Hussain. (AR at 209.) This was the Plaintiff's first visit after she had stopped working. (AR at 209.) At this visit, the Plaintiff reported fatigue and urge incontinence. (AR at 209.) Dr. Hussain noted that the Plaintiff continued to experience knee pain, neck pain, fatigue and lower back pain. (AR at 209.) Again, Dr. Hussain indicated diagnoses of abdominal pain, osteoarthritis of the left knee, tumid lupus and fibromyalgia. (AR at 209.)

Two months later, on May 14, 2004, the Plaintiff reported a new rash, described by Dr. Hussain as "new + worse." (AR at 194.) Dr. Hussain noted that the Plaintiff was suffering from myalgias and arthralgias in the knees, elbows, ankles, and hands. (AR at 194.) She further noted the Plaintiff's diagnoses of osteoarthritis of the left knee, tumid lupus and fibromyalgia. (AR at 194.) During this exam, Dr. Hussain observed that the Plaintiff had tenderness of the joints in her hands and a rash on her chest. (AR at 194.) Laboratory tests from this date revealed no abnormalities. (AR at 195–97.)

Only one week later, on May 21, 2004, the Plaintiff returned to Rheumatology Associates to be examined by Dr. Hussain. (AR at 193.) The Plaintiff reported paraspinal back pain and fatigue. (AR at 193.) Dr. Hussain again diagnosed the Plaintiff with tumid lupus and fibromyalgia. (AR at 193.) The next month, during a June 18, 2004 visit with Dr. Hussain, the

Plaintiff complained of a new lesion on her back. (AR at 192.) Dr. Hussain repeated her diagnosis of tumid lupus and fibromyalgia. (AR at 192.)

The Plaintiff returned to Rheumatology Associates twice for follow up visits after the June 18, 2004 visit. (AR at 187, 185.) First, on July 20, 2004, the Plaintiff had a follow-up examination that was performed by Dr. Sarah J. Johnson, who was another doctor at Rheumatology Associates. (AR at 187.) The Plaintiff complained of pain in the left hip, a rash developing on her chest and fatigue to a mild degree for the last three months. (AR at 187.) In her notes for this visit, Dr. Johnson wrote "S/P breast cancer" in the working diagnosis section. (AR at 187.) This differed from the Plaintiff's treating physician at the time, Dr. Hussain, who had, as discussed above, diagnosed the Plaintiff with tumid lupus, fibromyalgia, and osteoarthritis in the left knee. (AR at 187.)

On September 14, 2004, the Plaintiff had a second follow-up visit with Dr. Johnson. During this examination, the Plaintiff complained that the rash was now on her face. (AR at 185.) She further complained of fatigue and arthralgia. (AR at 185.) Laboratory tests from this date did not indicate any abnormalities. (AR at 182–84.) Dr. Johnson included no working diagnosis in her notes for this visit. (AR at 185.) However, for both the July 18, 2004 exam and the September 14, 2004 exam, Dr. Johnson's notes indicated a diagnosis of lupus discoid in the permanent diagnosis section. (AR at 187, 185.)

The Plaintiff returned to seeing Dr. Hussain on October 21, 2004. (AR at 181.) At this visit, the Plaintiff complained of fatigue, achy knees and chest tightness. (AR at 181.) Dr. Hussain observed that the Plaintiff was experiencing some chest occlusion and wheezing and diagnosed her with lupus discoid. (AR at 181.) Dr. Hussain also took x-rays of the Plaintiff's

left hip during this examination, which revealed subchondral sclerosis and minimal osteophytosis at the inferior margin of the femoral head. (AR at 177.)

On November 10, 2004, the Plaintiff underwent an MRI of her left hip at BAB Radiology. (AR at 167.) The MRI was performed by Dr. Elizabeth Schultz. Dr. Schultz noted that there was "no change from [the] previous [MRI] study" performed by Dr. Lieberman on the Plaintiff on April 5, 2003, and that there was "minimal fluid in [the] left hip, probably within range of normal." (AR at 166–67.)

In a letter dated November 15, 2004, Dr. Schultz informed Dr. Hussain of her findings from the November 10, 2004 x-ray. (AR at 166.) She indicated that the Plaintiff had a clinical history of "[p]ain, breast cancer, cervical cancer, lupus, asthma, fibromyalgia." (AR at 166.) She further indicated that she was comparing the Plaintiff's November 10, 2004 MRI with the Plaintiff's April 5, 2003 MRI. According to Dr. Schultz, her impression of the Plaintiff's left hip was "[m]inimal joint fluid in the left hip that is probably within the physiologic range of normal," which was "unchanged from the patient's previous [MRI] study of 2003." (AR at 166.)

On December 1, 2004, the Plaintiff again visited Dr. Hussain and complained of a cough, as well as left hip pain and locking. (AR at 176.) During the examination, Dr. Hussain observed that the Plaintiff was suffering pain in the left hip, as well as tenderness in the MCP, proximal interphalangeal ("PIP") and metatarsophalangeal ("MTP") joints. (AR at 176.) Dr. Hussain diagnosed the Plaintiff with tumid lupus and fibromyalgia. (AR at 176.)

At her January 26, 2005 examination with Dr. Hussain, the Plaintiff once more complained about left hip pain and locking. (AR at 171.) Dr. Hussain noted that the Plaintiff was experiencing pain on rotation of the hip and tenderness over the joints in her hands. (AR at

171.)  Again, she diagnosed the Plaintiff with tumid lupus and fibromyalgia.  (AR at 176.)  She

also diagnosed the Plaintiff with possible SLE.  (AR at 176.)

On June 16, 2005, Dr. Samir Dutta, a consultative physician hired by the Defendant,

examined the Plaintiff.  (AR at 249–52.)  The Plaintiff reported pain over her knees, hands, back

and hips since 2001.  (AR at 249-50.)  She also reported thyroid swelling.  (AR at 249–50.)  Dr.

Dutta noted that for her lupus and fibromyalgia, the Plaintiff was taking the medications

Plaquenil, Relafen, Nexium, Ultracet and Ditropan.  (AR at 249–50.)  He diagnosed the Plaintiff

with a history of fibromyalgia; lupus; thyroid enlargement and nodules; post right radical

mastectomy with early reconstruction; and possible early osteoarthritis of the lumbosacral spine

and hips.  (AR at 251.)  Dr. Dutta opined that the Plaintiff had a "mild limitation for sitting,

standing, walking, and carrying weight on a continued basis."  (AR at 251.)

The next month, on July 7, 2005, a New York State Agency physical RFC assessment

was completed by M. Fox, Disability Analyst II.  (AR at 254–59.)  The record does not indicate

whether Fox actually examined the Plaintiff.   According to Fox's RFC Assessment, the

Plaintiff's lupus and fibromyalgia limited her to (1) lifting twenty pounds occasionally and ten

pounds frequently; (2) sitting, standing and/or walking for six hours in an eight-hour workday;

(3) occasional performance of postural maneuvers; and (4) occasionally climbing, balancing,

stopping, kneeling, crouching, and crawling.  (AR at 254-59.)  Fox found that the Plaintiff had

no limitations for pushing and/or pulling.  (AR at 255.)  Fox further determined that the

Plaintiff's complaints of pain were partially credible.  (AR at 257.)  She opined that the Plaintiff

could climb, balance, stoop, kneel, crouch and crawl occasionally.  (AR at 254–59.)

According to an unsigned and undated Interrogatory for Medical Expert form, the

Plaintiff had no severe impairments during the time period between January 8, 2004, and July 5,

2007.  (AR at 299.)  The Defendant asserts that this form was completed by Dr. Charles Plotz, who did not examine the Plaintiff but whose opinion was obtained by ALJ Cohen.  (Def. Mem., pg. 11–12; AR at 11, 299.)  The record also does not appear to indicate whether Dr. Plotz specialized in any particular area of medicine.

In addition, without examining the Plaintiff and on an unspecified date, Dr. Plotz completed an RFC assessment for the Plaintiff.  (AR at 300–08.)  It appears to the Court that Dr. Plotz made his assessments on the Plaintiff's medical condition based solely on the evidence contained in the administrative record.  (Def. Mem., pg. 11–12; Pl. Mem., pg. 7.)  Dr. Plotz's RFC assessment referenced the Plaintiff's diagnoses of lupus, her history of breast cancer and the x-ray evidence of osteoarthritis of her left hip, but does not mention her diagnoses of fibromyalgia.  (AR at 300–308.)  Based on his review of the record, Dr. Plotz opined that the Plaintiff (1) could lift twenty pounds occasionally and ten pounds frequently; (2) could sit, stand and/or walk for six hours in an eight-hour workday; and (3) had no limitations for pushing and/or pulling.  (AR at 302.)  Dr. Plotz believed there was minimal x-ray evidence of osteoarthritis at the left hip.  (AR at 307.)  He also noted that although the Plaintiff's treating doctor claimed that the Plaintiff had lupus, tests for systemic diseases had repeatedly come back negative.  (AR at 307.)

On July 9, 2007, Dr. Peter M. Rumore of Rheumatology Associates completed a SLE RFC questionnaire concerning the Plaintiff.  (AR at 260–66.)  Dr. Rumore stated that since 2003, the Plaintiff had been seen in the office every two to three months for lupus and fibromyalgia.  (AR at 260.)  According to Dr. Rumore, the Plaintiff did not meet the diagnostic criteria for SLE, which requires the presence of four out of eleven of the first listed signs or symptoms.  (AR at 260–62.)  However, he noted that she did present with three of these eleven signs or symptoms,

as follows: (1) malar rash; (2) photosensitivity; and (3) non-erosive arthritis in the hands, wrists, heels and feet. (AR at 260–62) In addition, the Plaintiff presented with symptoms of severe fatigue, severe malaise and Sjogren's syndrome. (AR at 260–62.)

Dr. Rumore opined that the Plaintiff (1) would be capable of a low stress job; (2) was not a malingerer; and (3) would frequently experience systems severe enough to interfere with the Plaintiff's attention and concentration. (AR at 262.) He further opined that the Plaintiff (1) could sit for thirty minutes at a time; (2) could stand for twenty minutes; (3) could sit, stand or walk for about two hours in an eight-hour workday; (4) would need to alternate positions at will; and (5) would need to take unscheduled breaks approximately four times a day for thirty minutes before returning to work. (AR at 263.) In addition, he found that the Plaintiff (1) could occasionally lift ten pounds; (2) could never lift twenty to fifty pounds; (3) could perform repetitive reaching for only ten percent of the workday; (4) could perform handling for only ten percent of the workday; (5) could perform fingering for only five percent of the workday; (6) could never stoop or crouch; and (7) had to avoid exposure to smoke, fumes, odors and dusts. (AR at 264–65.) According to Dr. Rumore, the Plaintiff was likely to have good days and bad days, which would result in her missing work more than three times a month. (AR at 265.)

Dr. Rumore also completed a Fibromyalgia Medical Source Statement. (AR at 267–70.) He stated that the Plaintiff met the American Rheumatological criteria for fibromyalgia and that she presented with the following symptoms: (1) multiple tender points; (2) nonrestorative sleep; (3) chronic fatigue; (4) morning stiffness; (5) muscle weakness; and (6) Sicca symptoms with pain in the lumboscaral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands/fingers, hips and knees/ankles/feet. (AR at 267–68.) According to Dr. Rumore, the

Plaintiff had subjective complaints of generalized pain, aching pain and fatigue, and those factors that precipitated her pain were fatigue, movement/overuse and stress. (AR at 268.)

As was the case with the Plaintiff's lupus, Dr. Rumore stated that the Plaintiff's experience with pain caused by fibromyalgia would frequently interfere with her attention and concentration. (AR at 269.) With regards to the Plaintiff's functional limitations, Dr. Rumore referenced the assessment for lupus, detailed above. (AR 269–70.)

On July 15, 2008, two registered physician assistants ("RPAs") completed separate Medical Source Statements-Lumbar Spine (the "Medical Source Statements") for the Plaintiff's primary care physician, Dr. Anthony Guida. (AR at 287–92, 293–98, 326.) These statements were completed after a June 24, 2008 MRI of the Plaintiff's lumbar spine. (AR at 279.) This MRI revealed (1) bulging discs at L3-4 and L4-5, which impinged on the thecal sac; (2) mild spinal stenosis at L4-5; and (3) degenerative disease. (AR at 279.) Based on the MRI, both RPAs diagnoses the Plaintiff with lumbago. (AR at 287, 293.)

According to the Medical Source Statements, the Plaintiff was experiencing stiffness, paresthesia and pain that radiated to her legs. (AR at 287–88, 293–94.) On examination, the Plaintiff had decreased range of motion, muscle spasm and positive straight leg raising. (AR at 287–88, 293–94.) In addition, one of the RPAs opined that the Plaintiff's fibromyalgia could have been responsible for overlapping or exacerbating the pain that the Plaintiff was experiencing. (AR at 288.) Both RPAs assessed that the Plaintiff (1) could sit, walk, or stand for less than two hours in an eight-hour workday; (2) needed to get up and walk around frequently, or every thirty minutes for about five minutes; (3) needed to be able to shift positions at will; (4) needed unscheduled breaks every fifteen minutes for five minutes; (5) had no limitation for repetitive reaching, handling or fingering; (6) would likely be absent from work more than four

times a month; and (7) could never lift. (AR at 290–92, 296–98.) Moreover, the RPAs believed

that these impairments were likely to produce "good days" and "bad days" for the Plaintiff. (AR

at 291, 297.)

Dr. Rumore continued to treat the Plaintiff in 2007 and 2008. (AR 276–77.) On July 17,

2008, Dr. Rumore completed another SLE RFC questionnaire reaffirming his opinions from the

previous July 9, 2007 questionnaire. (AR at 280–86.)

Almost two years later, on March 9, 2009, Dr. Rumore wrote a letter to the Plaintiff's

attorney concerning her case. In the letter, he stated:

> [The Plaintiff] first came to our office at Rheumatology Associates
> in July 2003. I took over her medical care on December 29, 2005.
> She is seen in my office approximately three to four times per year.
> She has a diagnosis of systemic lupus, osteoarthritis of the lumbar
> spine, osteoartitis of the knees, and fibromyalgia. Her treatments
> have consisted of prescription drugs including Plaquenil,
> gabapentin, Pamelor, Soma, Darvocet, and Vicodin.
>   Her symptoms consist of joint pain with varying degrees of
> severity from mild to severe. She has extreme fatigue and malaise,
> which is barely constant and easy fatigability.
>   She stopped working because of her symptoms in 2004.
>   While I am not entirely certain an exact time when she was
> unable to work, she has been struggling with her illness for many
> years and has become increasing symptomatic because of her
> symptoms.
>   I have not doubted the severity of her complaints or her
> veracity. She has been compliant with her treatments and visits.
>   I believe that she is not capable of working in any capacity
> in a competitive work environment. She would require many days
> when she was not available to go to work because of her symptoms
> and thus would be absent frequently. She would not be able to
> sustain an adequate workday for employers.
>   Thus, I believe she is disabled from work in any capacity.

(AR at 88.)

### 3. The September 22, 2011 Hearing

As stated above, on September 22, 2011, a hearing was conducted by ALJ Cohen regarding the alleged date of onset of disability.  (AR at 309–44.)  Specifically, ALJ Cohen was tasked with determining whether the Plaintiff was disabled between the period of January 8, 2004 and July 4, 2007.  (AR at 312.)

The September 22, 2011 hearing was the result of the June 14, 2011 Remand Order by the Appeals Council, which noted that the prior March 26, 2009 decision by ALJ Weiss based its conclusions, at least partially, on the erroneous assertion that Dr. Rumore did not examine the Plaintiff prior to July 5, 2007.  (AR 91–92.)  The June 14, 2011 Remand Order was similar to the first Remand Order of May 30, 2008 and instructed the ALJ to give further consideration to the opinion of Dr. Rumore, as the Plaintiff's treating physician.  (AR at 63–64, 91–92.)  In addition, the Appeals Council instructed the ALJ to give further consideration to the Plaintiff's maximum RFC and obtain evidence from a VE to clarify the effect of the assessed limitations on the Plaintiff's occupational base.  (AR at 92.)

At the September 22, 2011 hearing, the Plaintiff testified that she had not worked at anytime between January of 2004 and July of 2007.  (AR at 314–15.)  Prior to that time, the Plaintiff testified that since 1994, she worked as an office manager for Sterling Optical.  (AR at 315.)  When the Plaintiff started working at Sterling Optical, she was a part-time employee and worked on accounts payable.  (AR at 315.)  However, in 1997 or 1998, she became the full-time office manager.  (AR at 315.)  As office manager, the Plaintiff still did accounts payable, but she also (1) handled any issues the managers brought to her from the ten stores she oversaw; (2) ordered office supplies; and (3) trained employees.  (AR at 316.)

The Plaintiff explained that she stopping working in January of 2004, when she experienced pain in her joints, especially in her hands, and fatigue which caused her to cut back on her hours on multiple occasions. (AR at 318.) She testified that "[t]hen I was down to, like, two days a week. And it was just – I couldn't – I'd have a good day. I'd have a bad day. And I just never knew what would be the good day and what would be the bad day. And he, he really – he worked with me, but he really needed somebody more[.]" (AR at 318–19.)

According to the Plaintiff, she could not sit, stand or walk for long, and could only lift ten pounds. (AR at 319–20.) She also allegedly had trouble with her grip in relation to everyday tasks like writing and opening jars. (AR at 321–22.)

The Plaintiff testified that since January of 2004 she was being seen by physicians at Rheumatology Associates. (AR at 322-23.) She first saw Dr. Labarca, until he left the practice to do research, followed by Dr. Hussein, until he moved out of the practice. (AR at 322-23.) She was then seen by Dr. Rumore. (AR at 322–23.)

Concerning her daily routine, the Plaintiff stated that on a typical day she would get up around noon, have coffee and make simple meals due to her inability to stand for long period. (AR at 327-28.) Any household tasks such as cleaning, laundry and food shopping were done with assistance from the Plaintiff's children. (AR at 327–28.) The Plaintiff would pass time by watching TV, reading books and doing crossword puzzles. (AR at 328–29.)

Ms. Leopold, an impartial VE, also testified at the hearing. (AR at 330–43.) Her testimony was obtained by ALJ Cohen in compliance with the June 14, 2011 Remand Order. (AR at 11.) The transcript of the hearing does not provide Leopold's first name. (AR at 309–44.)

Leopold explained that the Plaintiff's past work as an office manager was light and skilled, requiring the skills of scheduling, data entry, basic computer skills, interpersonal skills and dealing with the public. (AR at 331–32.) She further opined that the Plaintiff's skills would transfer to light and sedentary work as a front desk receptionist, telephone order clerk or office clerk, among other jobs. (AR at 332–35.) According to Leopold, these identified positions would all require good use of both hands, including fingering, handling and reaching. (AR at 340–42.)

## C.  ALJ Cohen's Findings

As a result of ALJ Weiss's partially favorable decision on March 26, 2009, the Plaintiff was considered disabled beginning on July 5, 2007, but was not considered disabled prior to that date as the Plaintiff alleged. (AR at 69–81.) Thus, as explained above, on remand, the issue before ALJ Cohen centered on whether the Plaintiff was disabled during the period of January 8, 2004 to July 4, 2007, which was before the July 5, 2007 date determined by ALJ Weiss. (AR at 90–93.)

On January 12, 2012, ALJ Cohen issued his decision. (AR at 8–17.) In his decision, he addressed whether the Plaintiff was disabled under §§ 216(i) and 223(d) of the Act for the period from January 8, 2004, to July 4, 2007. (AR at 11.) In addition, he noted that in order to be entitled to a period of disability and disability insurance benefits, the Plaintiff was required under §§ 216(i) and 223 of the Act to establish that she was disabled on or before December 31, 2013, which was the date she was last insured for disability insurance benefits. (AR at 11.) "After careful consideration of all the evidence, [ALJ Cohen] conclude[d] the [Plaintiff] was not under a disability within the meaning of the Social Security Act from January 8, 2004, through the date last insured." (AR at 12.)

In particular, ALJ Cohen found that:

1. The [Plaintiff] last met the insured status requirements of the [ ] Act on December 31, 2008.
2. The [Plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of January 8, 2004 through her date last insured of December 31, 2008.
3. Through the date last insured, the [Plaintiff] had the following medically determinable impairments: fibromyalgia and osteoarthritis.
4. Through the date last insured, the [Plaintiff] did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the [Plaintiff] did not have a severe impairment or combination of impairments.  Basic work activities are the abilities and aptitudes necessary to do most jobs.  Examples of these include: 1. Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; 2. Capacities for seeing, hearing, and speaking; 3. Understanding, carrying out, and remembering simple instructions; 4. Use of judgment; 5. Responding appropriately to supervision, co-workers, and usual work situations; and 6. Dealing with changes in a routine work setting.

(AR at 13–14, citations omitted.)

ALJ Cohen explained that "[i]n reaching th[is] conclusion. . . [he] considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical and other evidence," as well as opinion evidence.  (AR at 14.)  He reasoned that while "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptom[,] [ ] the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the finding that the [Plaintiff] has no severe impairment or combination of impairments."  (AR at 15.)

In this regard, ALJ Cohen emphasized evidence that the Plaintiff was not disabled from an oncologic standpoint with regard to post-breast cancer and that her laboratory tests

consistently came back normal.  (AR at 15.)  In addition, he stated that the "[Plaintiff's] own testimony support[ed] this finding" because "activities at this level [were] not consistent with an inability to perform any substantial gainful activity."  (AR at 16.)  According to ALJ Cohen, these activities included preparing simple meals, doing laundry, washing dishes, cleaning and shopping.  (AR at 14.)  Consequently, the ALJ concluded "the [Plaintiff's] allegations of pain and functional limitations prior to July 5, 2007 were not fully credible and exaggerated the extent of her symptomology."  (AR at 16.)

In ALJ Cohen's decision, he made note that the June 14, 2011 Remand Order instructed the ALJ to "fully develop the record with new and material evidence, obtain a VE's testimony if necessary and further consider the [Plaintiff's] treating sources."  (AR at 11.)  To comply with this Remand Order, ALJ Cohen "obtained a medical interrogatory from Dr. [ ] Plotz," which "was proffered to the [Plaintiff's] attorney on November 21, 2011 [but] no reply was received[.]"  (AR at 11.)  Therefore, ALJ Cohen found that the record was complete.  (AR at 11.)

With respect to the opinions of the Plaintiff's treating physicians, ALJ Cohen did not appear to further consider these treating sources in accordance with the June 14, 2011 Remand Order.  In this regard, despite the Remand Order specifically challenging ALJ Weiss's erroneous conclusion that Dr. Rumore began treating the Plaintiff on July 5, 2007 and instructing that the ALJ assigned on remand give further consideration to his opinion, ALJ Cohen nevertheless gave "little weight to the opinion of Dr. Rumore, as he did not treat the claimant until July 5, 2007, the [Plaintiff's] approved onset date."  (AR at 15, 91–92.)  ALJ Cohen provided no additional explanation for his determination beyond this sentence.  (AR 11–17.)

ALJ Cohen also gave little weight to the opinion of Dr. Guida, even though he was the Plaintiff's primary care physician, because it was given "well after the period at issue and [did]

not state when her limitations began." (AR at 16.) However, ALJ Cohen did give "significant weight" to the opinion of Dr. Dutta, who consulted for the SSA. (AR at 16.) Also, ALJ Cohen "accord[ed] great weight" to the opinion of Dr. Plotz on that ground that Dr. Plotz "reviewed the entire medical record." (AR at 16.) Specifically, ALJ Cohen found Dr. Plotz's opinion to be "consistent with the substantial evidence of the record," even though Dr. Plotz never examined the Plaintiff in person. (AR at 16.)

Accordingly, ALJ Cohen determined that "[t]he [Plaintiff] was not under a disability, as defined in the Social Security Act, at any time from January 8, 2004, the alleged onset date, through July 4, 2007." (AR at 16.)

## II. DISCUSSION

### A. Standards of Review

An unsuccessful claimant for Social Security benefits may bring an action in federal district court to obtain judicial review of the denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record. See 42 U.S.C. § 405(g); Janinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Brown v. Apfel, 174 F.3d 59, 61–62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), and requires such relevant evidence that a reasonable person "might accept as adequate to support a conclusion." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).

In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques; results from frequent examinations; and is consistent "with the other substantial evidence in [the] case record." See Clark v. Commissioner of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the weight he gives the claimant's treating source's opinion." Id.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark, 143 F.3d at 118. Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Secretary of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). A reviewing court may "enter upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decisions of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.  Analytical Framework for Determining Disability

To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a Plaintiff must establish her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a

continuous period of not less than twelve months." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). The Act also provides that the impairment must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id.

Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims, including: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" medically determinable physical impairment which will impair the claimant from doing basic work activities; (3) whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in Appendix 1 of the regulations; (4) an assessment of the claimant's residual functional capacity and ability to continue past relevant work despite severe impairment; and (5) an assessment of the claimant's residual functional capacity along with age, education, and work experience. As to the last stage of the inquiry, the burden shifts to the ALJ to show that the claimant can perform alternative work. See 20 C.F.R. §§ 404.1520, 416.920.

When proceeding through this five step analysis, the ALJ must consider the objective medical facts; the diagnoses or medical opinions based on these facts; the subjective evidence of pain and disability; and the claimant's educational background, age, and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

**C. As to Whether the ALJ Committed Reversible Error by Allegedly Failing to Comply With the Appeals Council's June 14, 2011 Remand Order**

First, the Plaintiff challenges the January 12, 2012 decision by ALJ Cohen on the ground that he committed reversible error by failing to comply with the Appeals Council's June 14, 2011 Remand Order. (Pl. Mem., pg 9.)

Regulations provide that on remand from the Appeals Council, "[t]he [ALJ] shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council remand order." 20 C.F.R. § 404.977(b) (emphasis added). If an ALJ fails to comply with an Appeals Council remand order, their decision is subject to judicial review and can form the basis for a remand to the Commissioner. 45 U.S.C.A. § 205(g).

In the present case, the Appeals Council specifically directed the ALJ to give further consideration to Dr. Rumore's opinion "pursuant to the provisions of 20 [C.F.R.] 404.1527 and Social Security Rulings 96-2p and 96-5p, and explain the weight given to such opinion evidence." (AR at 92.) In addition, the Appeals Council directed the ALJ assigned on remand to do the following:

> [to] request that Dr. Rumore provide additional evidence dated back to July 2003, and further clarification of the opinion and medical source statements about what the [Plaintiff] could still do despite the impairments through July 4, 2007. The [ALJ] may enlist the aid and cooperation of the [Plaintiff's] representative in developing evidence from the [Plaintiff's] treating source.

(AR at 92, citation omitted.)

As the Plaintiff correctly points out, the Appeals Council discussed Dr. Rumore's opinion in great detail, stating as follows:

> The [March 26, 2009] hearing decision [by ALJ Weiss] indicates, page eight, that there is no documentary evidence that Dr. [ ] Rumore, specialist, of Rheumatology Associates of Long Island, personally examined the [Plaintiff] prior to July 5, 2007, or that his assessment of the [Plaintiff's] functional capacity extended prior to July 5, 2007. The medical evidence of record contains a Lupus Residual Function Capacity Questionnaire dated July 17, 2008, completed by Dr. Rumore, which indicate that the client had been seen in the office since 2003, every two to three months. Additional evidence submitted in connection with the request for review includes a letter dated March 9, 2009, from Dr. Rumore, stating that the [Plaintiff] first came to their office in July 2003 and he took over the [Plaintiff's] medical care on December 29, 2005.

24

> Dr. Rumore indicated that the [Plaintiff] has doctor visits in his office approximately three to four times per year and has a diagnosis of systemic lupus, osteoarthritis of the lumbar spine, osteoarthritis of the knees, and fibromyalgia. Dr. Rumore notes that the [Plaintiff] had subjective complaints of mild to severe joint pain, extreme fatigue and malaise. He indicated that "she has been struggling with her illness for many years and has become increasingly symptomatic."

(AR at 91, citation omitted.)

Despite these directives from the Appeals Council in the June 14, 2011 Remand Order, ALJ Cohen reached a decision that was virtually indistinguishable from that of ALJ Weiss with regard to Dr. Rumore. Similar to ALJ Weiss, ALJ Cohen accorded little weight to Dr. Rumore's opinion. (AR at 15.) In fact, in the one sentence he dedicated to addressing the opinion of Dr. Rumore, ALJ Cohen explained that he gave Dr. Rumore's opinion little weight because "he did not treat the [Plaintiff] until July 5, 2007, the [Plaintiff's] approved onset date." (AR at 15.) This is directly contrary to the holding of the Appeals Council in the June 14, 2011 Remand Order (AR at 91–92.)

Indeed, the record does not support this finding. (AR 91–92.) Dr. Rumore stated in his March 9, 2009 letter to the Plaintiff's counsel that he "took over [the Plaintiff's] medical care on December 29, 2005"; that the Plaintiff "[was] seen in [his] office approximately three to four times per year; and that "[s]he ha[d] been struggling with her illnesses for many years and ha[d] become increasingly symptomatic because of her symptoms." (AR at 88.)

In the Court's view, ALJ Cohen failed to adequately demonstrate that he gave further consideration to Dr. Rumore's opinion as required by the June 14, 2011 Remand Order. (AR at 11–17, 91–92.) Nor does it appear to the Court that ALJ Cohen complied with the Appeals Council's specific instruction that the ALJ on remand develop the record with additional evidence from Dr. Rumore. (AR at 11–17, 91–92.)

Instead, ALJ Cohen seemingly only sought out the opinion of Dr. Plotz, who was a non-treating source, and took no additional steps to expand the record with evidence from the Plaintiff's treating physicians concerning the Plaintiff's condition prior to July 5, 2007. However, as the Plaintiff astutely argues, the interrogatory provided by a non-examining physician like Dr. Plotz "has nothing to do with the directive of the Appeals Council to develop evidence from Dr. Rumore." (AR at 159–60; Pl. Mem., pg. 11.) See Hynes v. Astrue, No. 12–CV–719 (JFB), 2013 WL 3244825, at *11–12 (E.D.N.Y. June 26, 2013) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history . . . . [T]he ALJ was required to recontact [the] plaintiff's treating physician if the evidence from the treating physician was inadequate for the Commissioner to determine whether an individual was disabled.") (citations and internal quotation marks and brackets omitted); Pereira v. Astrue, 279 F.R.D. 201, 206 (E.D.N.Y. 2010) ( "[T]he ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record."); Rivera v. Commissioner of Social Sec., 728 F. Supp. 2d 297, 322 (S.D.N.Y. 2010) ("Where the ALJ has failed to develop the record adequately, remand to the Commissioner for further development is appropriate.")

Accordingly, the Court finds that remand of this case to the ALJ is appropriate due to the ALJ's failure to develop the record in compliance with the Appeal Council's June 14, 2011 Remand Order. See Savino v. Astrue, Case No. 07-CV-4233 (DLI), 2009 WL 2045397, at *10 (E.D.N.Y. July 8, 2009) (holding that remand was required on the basis that the ALJ "ignored the remand order" and "disregarded the Appeals Council's explicit directives" to "use a [VE] to help determine whether [the] plaintiff could perform his past relevant work"); see also Tauber v. Banrhart, 438 F. Supp. 2d 1366, 1376 (N.D. Ga. 2006) (stating that the ALJ erred in failing to

follow the Appeals Council's remand order, which called for, among other directives, consideration of whether the jobs identified as available for the claimant "would allow her to alternate between sitting and standing"); Thompson v. Barnhart, Case No. Civ.A. 05-395, 2006 WL 709795, at *11–12 (E.D. Pa. Mar. 15, 2006) (remanding the case to the ALJ because the ALJ "committed legal error by . . . by not following the regulations of the Social Security Administration itself which require adherence to remand orders of the Appeals Council"); Mann v. Chater, Case No. 95 CIV. 2997 (SS), 1997 WL 363592, at *3 (S.D.N.Y. June 30, 1999) ("The ALJ should have followed the order of the Appeals Council. Because he did not, I must remand this action.") (citation omitted).

## D. As to Whether ALJ Cohen's Assessment that the Plaintiff was not Disabled at Step Two Before July 5, 2007 was Supported by Substantial Evidence

Although the Court has determined that remand to the ALJ is required in this case due to the failure to follow the directives of the Appeal's Council's June 14, 2011 Remand Order, the Court nevertheless considers the parties other arguments so that any other deficiencies that may be present in ALJ Cohen's determination can also be remedied on remand. See, e.g., Bunn v. Colvin, 11-CIV-6150 NGG, 2013 WL 4039372, at *8 (E.D.N.Y. Aug. 7, 2013) (finding that even though the court held that remand was required due to the ALJ's failure to properly follow the treating physician rule, it was appropriate for the court to address whether there were any "deficiencies in the ALJ's RFC determination . . . so that," if there were "they, too may be remedied on remand").

In this regard, according to the Defendant the Plaintiff "did not sustain her burden of establishing that her impairments significantly limited her ability to perform basic work activities" during the period in question, January 8, 2004 through July 4, 2007. The Plaintiff counters that the Defendant and ALJ Cohen have defined and applied step two incorrectly, and

"improperly relied on the absence of certain findings that simply do not exist in a disability claim based on fibromyalgia." (Pl. Mem., pg. 12–13.) In addition, the Plaintiff argues that the decision reached by ALJ Cohen regarding step two was erroneous due to violation of the treating physician rule. The Court will consider each of these arguments in turn.

1. **Whether the Correct Legal Standard Was Used in Determining the Severity of the Impairment**

As abovementioned, "[a]t step two of the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities." Desmond v. Astrue, No. 11–CV–0818 (VEB), 2012 WL 6648625, at *3 (N.D.N.Y Dec. 20, 2012) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). "The Act defines 'basic work activities' as 'abilities and aptitudes necessary to do most jobs,' and includes physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." Morgan v. Astrue, 11-CV-1009, 2014 WL 318184, at *9 (W.D.N.Y. Jan. 29, 2014) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)).

"[T]he severity prong is intended as a de minimis standard to screen out only those claimants with 'slight' limitations that 'do not significantly limit any basic work activity.'" Vicari v. Astrue, 1:05-cv-4967-ENV-VVP, 2009 WL 331242, at *3 (E.D.N.Y. Feb. 10, 2009) (quoting Bowen v. Yuckert, 482 U.S. 137, 158, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (O'Connor, J., concurring, joined by Stevens, J.)); see also Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (holding that "the severity regulation is valid only if applied to screen out de minimis claims"). Of importance, courts in the Second Circuit have found that "[a] finding of

not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work." Juarbe v. Astrue, 3:10CV1557 MRK WIG, 2011 WL 4542964, at *6 (D. Conn. Aug. 30, 2011), report and recommendation adopted, 3:10CV1557 MRK WIG, 2011 WL 4542962 (D. Conn. Sept. 28, 2011) (quoting Rosario v. Apfel, No. 97CV5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999)) (internal quotation marks omitted). "If [] the disability claim rises above the de minimis level, then the analysis must proceed to step three." Mattei v. Barnhart, CV-01-1678 (SJF), 2003 WL 23326027 at *6 (E.D.N.Y. 2003).

In this case, ALJ Cohen held that that the Plaintiff had "medically determinable impairments" of fibromyalgia and osteoarthritis. (AR at 13.) With respect to the Plaintiff's fibromyalgia, he noted that the Plaintiff satisfied the requirements for making such a finding as set forth in Social Security Ruling ("SSR") 12-2p, which are as follows: (1) a physician has diagnosed fibromyalgia; (2) the physician has provided the evidence described either by the 1990 American College of Rheumatology (ACR) criteria or the 2010 ACR Preliminary Diagnostic Criteria; and (3) the physician's "diagnosis is not inconsistent with the other evidence on the person's case record." See SSR 12-2p, 2012 WL 3104869 (July 25, 2012).

Despite recognizing the Plaintiff's impairments, ALJ Cohen nevertheless found that the Plaintiff "did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months." (AR at 13.) As such, ALJ Cohen concluded that "the [Plaintiff] did not have a serve impairment or combination of impairments." (AR at 13.) In support of this determination, ALJ Cohen relied on "the substantial evidence of record, Dr. Plotz's opinion and the [Plaintiff]'s own testimony." (AR at 16.)

However, in the Court's view, ALJ Cohen misconstrued the applicable legal standard when making these findings. Indeed, "[m]indful that the existence of a severe impairment serves only as a threshold to be met for the purpose of screening out de minimis claims, [ALJ Cohen's] conclusion that [the] [P]laintiff's [fibromyalgia and osteoarthritis] were not severe impairments was not supported by substantial evidence." Isaacs v. Astrue, 07-CV-257, 2009 WL 528252, at *8 (W.D.N.Y. Mar. 2, 2009) (quoting Glavan v. Barnhart, No. CV–03–4139 (SJF), 2004 WL 2326384, at *7 (E.D.N.Y. Aug. 17, 2004)).

As the Plaintiff notes in her memorandum, both ALJ Cohen and the Defendant erroneously "focused on the lack of objective findings," as such findings "simply do not exist in a fibromyalgia case." (Pl. Mem., pg 15.) Indeed, as Judge Posner of the Seventh Circuit explained in Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996), "[fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." Id. Thus, any focus by the Defendant or by ALJ Cohen on the absence of objective evidence is misplaced, because "its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced." Id, see also Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (holding that a growing number of courts, including the Second Circuit, "have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'") (citing Lisa v. Sec'y of Dep't of Health & Human Servs. of U.S., 940 F.2d 40, 43 (2d Cir. 1991)); Harman v. Apfel, 211 F.3d 1172, 1179–80 (9th Cir. 2000); Kelley v. Callahan, 133 F.3d 583, 585 n.2 (8th Cir. 1998)); Preston v. Sec. of Health and Human Servs., 854 F.2d 815, 820 (6th Cir. 1988).

Rather, the main symptoms of fibromyalgia "are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." Sarchet, 78 F.3d at 307. In this case, the records from the Plaintiff's visits to Rheumatology Associates during the relevant period document that the Plaintiff was experiencing many of these symptoms, including polyarthralgias, morning stiffness, fatigue, pain, sicca symptoms and tender points on examination. (AR at 171, 176, 181, 187, 192–94, 209, 232.) These findings were reiterated by Dr. Rumore, the Plaintiff's treating rheumatologist, in his questionnaire dated July 9, 2007 and in his letter of March 9, 2009. (AR at 88, 267–68.) However, it appears that ALJ Cohen did not consider this evidence when making his determination. (AR at 15–16.)

Accordingly, the Court finds that ALJ Cohen erred in concluding that the Plaintiff's fibromyalgia was not a severe impairment, because he relied solely on the lack of objective evidence and did not consider evidence from Rheumatology Associates which revealed the nature of the Plaintiff's fibromyalgia symptoms. Thus, the Court remands this case to the ALJ on this ground as well.

## 2. Whether ALJ Cohen Gave the Proper Weight to Dr. Rumore's Opinion in Determining the Severity of the Plaintiff's Condition at Step Two

It is well-established that "the ALJ cannot rely solely on [the] RFCs [of the consulting examiners] as evidence contradicting the Treating Physician RFC. This is because an inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician." Moore v. Astrue, No. 07-cv-5207(NGG), 2009 WL 2581718, at *10 n.22 (E.D.N.Y. Aug. 21, 2009). Indeed, "[t]he Second Circuit has repeatedly stated that when

there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" Harris v. Astrue, No. 07–CV–4554 (NGG), 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990)). "This is because 'consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" Id. (quoting Cruz, 912 F.2d at 13).

Nevertheless, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." Id.; see also 20 C.F.R. § 404.1527(c) (2)–(6). In addition, "the regulations also specify that the Commissioner will always give good reasons in [his] notice of determination or decision for the weight [he] gives claimant's treating source's opinion." Id. (citations and internal quotation marks and alterations omitted).

In his decision in this case, ALJ Cohen simply stated that he was according "little weight to the opinion of Dr. Rumore, as he did not treat the [Plaintiff] until July 5, 2007, the [Plaintiff's]

approved onset date." (AR at 15.) ALJ Cohen did not address the Appeals Council's June 14, 2011 Remand Order, which indicated that ALJ Weiss's assertion that Dr. Rumore only began treating the Plaintiff in July of 2007 was not supported by evidence in the record. Further, beyond this statement, he did not provide any sort of detailed explanation for his conclusion.

Indeed, "in evaluating Dr. [Rumore's] opinion, the ALJ [did] not appear to have applied any of the factors provided by 20 C.F.R. § 404.1527(c)(2)–(6) for determining the weight to give a non-controlling opinion of a treating physician." Bunn v. Colvin, 11-CIV-6150 NGG, 2013 WL 4039372, at *7 (E.D.N.Y. Aug. 7, 2013) (citing Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998)). In this regard, ALJ Cohen provided no consideration to the fact that the Plaintiff had been treated by doctors at Rheumatology Associates since July of 2003 and had been seen three to four times per year. See id. at *7–8 (finding that "the ALJ erred" where "the ALJ's decision makes no reference to the fact that [the treating physician] is a specialist who had the opportunity to examine [the plaintiff] every one to three months over the course of fourteen months").

In addition, ALJ Cohen made no mention of the letter from March 2009 in which Dr. Rumore stated that he began treating the Plaintiff on December 29, 2005, prior to the approved onset date. (AR at 88.) ALJ Cohen also failed to acknowledge that the Plaintiff's treating physicians prior to December 29, 2005 left the practice at Rheumatology Associates through no fault of the Plaintiff, or that Dr. Rumore's opinion was consistent with all prior records from Rheumatology Associates. (AR at 322–23, 171–246.)

Further, in evaluating disability claims based on fibromyalgia, SSR 12-2p specifically recognized the importance of relying on the opinion of a medical provider, such as Dr. Rumore, since a treating source would have the longitudinal picture of a claimant's impairments, especially given the fact that fibromyalgia often involves varying signs and symptoms. See SSR

12-2p, 2012 WL 3104869 (July 25, 2012). This ruling states that when a consultative examiner is hired, they should have access to longitudinal information, as "the symptoms and signs of fibromyalgia may vary in severity over time and may even be absent some days[.]" Id. In addition, in discussing the assessment of an RFC, the SSR stresses the importance of considering "a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" Id. Of relevance here, Dr. Rumore acknowledged that the Plaintiff has both "good days" and "bad days" due to her fibromyalgia (AR at 265.)

Moreover, ALJ Cohen did not "explain why he found the opinion[s] of Dr. [Dutta and Dr. Plotz]—who examined [the Plaintiff] only one time [and not at all, respectively]. . . .—more convincing than the opinion of Dr. [Rumore]." Colvin, 2013 WL 4039372, at *7. Instead, the only apparent reason ALJ Cohen gave for giving Dr. Dutta's and Dr. Plotz's opinions considerable weight was because they were "consistent with the substantial evidence of the record." (AR at 16.) ALJ Cohen did not elaborate on this apparent consistency other than this conclusory statement.

In this regard, for example, Dr. Dutta's opinion was given "significant weight," despite the fact that he is an orthopedist and not a rheumatologist, the difference being that the former specializes in surgical treatments whereas the latter specializes in medically, as opposed to surgically, treatable joint disorders. The record does not indicate that Dr. Dutta had access to longitudinal information as SSR 12-2p recommends, due to the waxing and waning nature of fibromyalgia symptoms. SSR 12-2p, 2012 WL 3104869 (July 25, 2012).

Even more troubling is that Dr. Plotz's opinion was given "significant weight," despite the fact that he never examined the Plaintiff and his credentials are unknown. (AR at 299–308.)

When completing the RFC questionnaire, Dr. Plotz merely wrote "no" when asked whether the Plaintiff had a "severe impairment" during the relevant period, and did not bother to list the evidence he reviewed that supported his assessment. (AR at 299.) Significantly, there is no mention whatsoever of fibromyalgia, an impairment ALJ Cohen found was present in this case. (AR at 13, 307.)

The general rule regarding the written reports of medical advisors who have not personally examined a claimant is that such reports deserve little weight in the overall evaluation of disability. Vargas v. Sullivan, 898 F.2d 293, 295–96 (2d Cir. 1990). This is because the advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant. Id.; see also Hidalgo v. Bowen, 822 F.2d 294, 298 (2d Cir. 1987) (holding that the testimony of a nonexamining medical advisor "does not constitute evidence sufficient to override the treating physician's diagnosis"); Havas v. Bowen, 804 F.2d 783, 786 (2d Cir. 1986) (stating that "opinions of non-examining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians").

"Where an ALJ fails to consider all of the relevant factors in deciding what weight to assign the opinion of a treating physician, the ALJ's decision is flawed." Rivas v. Barnhart, No. 01 Civ.3672 RWS, 2005 WL 183139, at *22 (S.D.N.Y. Jan. 27, 2005) (citing Schaal, 134 F.3d at 504). "Failure to provide reasons for rejecting the treating physician's opinion is a proper basis for reversal and remand." Melendez v. Astrue, No. 08 Civ. 6374(LBS), 2010 WL 199266, at *3 (S.D.N.Y. Jan. 20, 2010) (citing Johnson v. Bowen, 817 F.2d 983, 985–86 (2d Cir.1987); Mellilo v. Astrue, No. 7:06–CV–0698 (LEK/DEP), 2009 WL 1559825, at *11–12 (N.D.N.Y. Jun. 3, 2009)).

Accordingly, the Court finds that remand for failure to properly apply the treating physician rule is also appropriate in this case.  See, e.g., McLean, 2012 WL 1886774, at *7 ("[T]he ALJ provided nothing close to 'good reasons' for the lack of weight he gave to [the treating physician's] opinion. . . . [T]he court must now remand [this] case for a proper evaluation of [the treating physician's] opinion.").

**E. As to Whether the Plaintiff's Testimony Was Inconsistent with a Finding of Disability**

In addition, the Plaintiff contends that ALJ Cohen erred by not crediting her testimony with regard to her statements concerning "the intensity, persistence, and limiting effects of [her] symptoms."  (AR at 14–15; Pl. Mem., pg. 21–24.)  In this regard, ALJ Cohen stated that the Plaintiff's testimony was "not credible to the extent [it was] inconsistent with [sic] finding that the [Plaintiff] has no severe impairment or combination of impairments."  (AR at 15.) According to the Plaintiff, the "failure of [] ALJ [Cohen] to properly consider [the Plaintiff's] primary medical condition of fibromyalgia necessarily resulted in his failure to properly analyze her pain and credibility.  Further, the ALJ's credibility finding is not supported by substantial evidence."  (Pl. Mem., pg. 21.)

As set forth by the Second Circuit, "[a] [Social Security] claimant's subjective report of [his] symptoms is not controlling but must be supported by medical evidence."  Vilardi v. Astrue, 447 F. App'x 271, 272 (2d Cir. 2012) (quoting 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529).  If the pain is not substantiated by objective medical evidence, the ALJ engages in a credibility inquiry, which

> implicates seven factors to be considered, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other

> measures that the claimant employs to relieve the pain; and
> (7) other factors concerning the claimant's functional limitations
> and restrictions as a result of the pain. § 404.1529(c)(3)(i)–(vii).

Meadors v. Astrue, 370 F. App'x 179, 183 n.1 (2d Cir. 2010).

The Court finds that ALJ Cohen erred in two significant ways when he made his credibility finding with respect to the Plaintiff. First, by finding that the Plaintiff's testimony was "not credible to the extent [it was] inconsistent with [sic] finding that the [Plaintiff] has no severe impairment or combination of impairments," (AR at 15), ALJ Cohen erroneously used what other courts have referred to as the "to the extent . . . inconsistent" formulation. Maldonado v. Commissioner of Social Sec., No. 12–CV–5297 (JO), 2014 WL 537564, at *17 (E.D.N.Y. Feb. 14, 2014) (collecting cases). "Court[s] have repeatedly rejected" the "use of [this kind of] shorthand credibility determination." Id. (collecting cases). Rather, an ALJ is required to "assess a [claimaint's] credibility before determining [her] RFC and identify which statements about the intensity and persistence of [her] symptoms are consistent with specifically identified evidence in the record," as well as "specify those statements [that the ALJ determines are inconsistent with medical evidence in the record] and explain why he chooses to discredit them with reference to the applicable regulatory factors." Id. (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)); see also Romanelli v. Astrue, No. CV–11–4908 (DLI ), 2013 WL 1232341, at *11 (E.D.N.Y. Mar. 26, 2013); Smollins v. Astrue, No. 11–CV–424 (JG), 2011 WL 3857123, at *10–11 (E.D.N.Y. Sept. 1, 2011).

Second, "ALJ [Cohen] failed to consider all of the seven credibility factors pursuant to 20 C.F.R. § 404.1529(c)(3)(i)-(vii)," which also represents a serious flaw in his credibility determination. Pereyra v. Astrue, No. 10–cv–5873 (DLI), 2012 WL 3746200, at *15 (E.D.N.Y. Aug. 28, 2012). Specifically, since "ALJ [Cohen] did not explicitly refer to or discuss any of the

factors listed in 20 C.F.R. 404.1529(c)(3)[,]" his ""credibility analysis was insufficient." Kane v. Astrue, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013).

Concerning the consideration of the nature of the Plaintiff's medical condition, the Plaintiff argues that in reaching his conclusion, ALJ Cohen "failed to property analyze her subjective complaints of pain, drowsiness, and impaired concentration, classic symptoms of fibromyalgia, on her ability to work." (Pl. Mem., pg. 21.) These symptoms were all noted by Dr. Rumore and are consistent with the Plaintiff's diagnosis of fibromyalgia. (AR at 267–69.) See also SSR 12-2p, 2012 WL 3104869 (July 25, 2012.) (noting that the symptoms of fibromyalgia can include widespread pain as well as "fatigue, cognitive or memory problems ('fibrofog'), waking unrepressed, depression, anxiety disorder, or irritable bowel syndrome . . ."). Moreover, numerous courts have agreed that fibromyalgia is a medical condition which can reasonably be expected to cause pain. See Green-Younger, 335 F.3d at 108 (2d Cir. 2003) ("[The plaintiff's] complaints of pain in her back, legs, and upper body, fatigue, and disturbed sleep are internally consistent and consistent with common symptoms of fibromyalgia."); Sarchet, 78 F.3d at 306 (recognizing that one of fibromyalgia's "principal symptoms" is "pain all over"); Johnston v. Barnhart, 378 F. Supp. 2d 274, 281 (W.D.N.Y. 2005) ("[A] diagnosis of fibromyalgia is based primarily, if not entirely, on subjective complaints of pain.").

In addition, one Illinois district court noted that "by definition" fibromyalgia means that the claimant's accounts of pain and fatigue would seem, in all likelihood, out of proportion with the available objective evidence. See Aidinovsky v, Apfel, 27 F. Supp. 2d 1097, 1103 (N.D. Ill. 1998). Thus, because the ALJ did not appear to consider either fibromyalgia's peculiar characteristics in assessing the claimant's credibility or the subjective nature of the symptoms of fibromyalgia, the Aidinovsky court held that the ALJ did not make an adequate credibility

determination and thus failed to properly assess the claimant's functional limitations. Id. In so finding, the Aidinovsky court criticized the ALJ for not discussing why she rejected evidence favorable to the claimant and how the uniquely subjective nature of the claimant's illness factored into the analysis. Id.

The Court finds that the reasoning of the Aidinovsky court is persuasive and that the same criticisms can be made of the ALJ Cohen decision here. Indeed, he failed to consider the uniquely subjective nature of the Plaintiff's fibromyalgia condition and selectively cited from the record in discrediting her complaints.

For example, ALJ Cohen referenced the Plaintiff's testimony about her daily activities in support of his finding that the Plaintiff did not have a severe impairment. (AR at 16.) In his decision, he stated the activities reported by the Plaintiff "were not consistent with an inability to perform any substantial gainful activity." (AR at 16.) The activities ALJ Cohen noted were preparing simple meals, doing laundry, washing dishes, cleaning and shopping. (AR at 14.) However, in the Court's view, ALJ Cohen mischaracterized the extent of these activities by failing to note that the Plaintiff also testified that (1) she made the easiest meals possible meals due to the fact that she could not stand for very long, and (2) her children assisted her with cleaning of the house, as well as with carrying the laundry and bags during shopping trips. (AR at 134, 327–28.) In addition, ALJ Cohen failed to note that the Plaintiff reported (1) resting between engaging in any activities; (2) finding it "almost impossible" to keep her house clean; and (3) "rest[ing] instead of going to lunch or dinner with friends." (AR at 133.)

In the Court's view, the Plaintiff's limited activities are consistent with her diagnosis of fibromyalgia and with the limitations posed by Dr. Rumore. (AR at 267–70.) Thus, her testimony should have been appropriately credited. In this regard, as explained above,

fibromyalgia can involve varying signs and symptoms, which "may vary in severity over time and may even be absent some days." SSR 12-2p, 2012 WL 3104869 (July 25, 2012). As such, an ALJ should give consideration to "a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" Id.

Also of importance, "[t]he Second Circuit has repeatedly recognized that '[a] claimant need not be an invalid to be found disabled.'" Colon v. Astrue, 10-CV-3779 KAM, 2011 WL 3511060, at *14 (E.D.N.Y. Aug. 10, 2011) (quoting Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988)) (internal brackets in the original). "Indeed, it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'" Valet v. Astrue, 10-CV-3282 KAM, 2012 WL 194970, at *19 (E.D.N.Y. Jan. 23, 2012) (quoting Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000)); see also Mitchell v. Colvin, 09-CV-5429 ENV, 2013 WL 5676289, at *7 (E.D.N.Y. Oct. 17, 2013) ("[E]vidence of a claimant's ability to complete household chores does not defeat a claim for disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'") (quoting Woodford, 93 F. Supp. 2d at 529); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("'When a disabled person gamely chooses to endure pain in order to pursue important goals,' such as attending church and helping his wife on occasion go shopping for their family, 'it would be a shame to hold this endurance against him in determining benefits unless him conduct truly showed that he is capable of working.'" (quoting Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989); Murdaugh v. Secretary of Dep't of Health & Human Servs., 837 F.2d 99, 102 (2d Cir. 1988) (holding that a claimant who watered a garden, occasionally visited friends, and was able

to get on and off an examination table was disabled because he could not perform sedentary work).

In sum, "ALJ [Cohen] did not identify what facts he found to be significant, indicate how he balanced the various factors, or specify which of [the] Plaintiff's alleged symptoms he found to be not credible." Mantovani v. Astrue, No. 09–CV–3957 (RRM), 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31, 2011) (citing Simone v. Astrue, No. 08–CV–4884, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009)). "[His] lack of specificity and failure to meet [SSA] requirements for evaluating the credibility of [the] Plaintiff's subjective complaints require remand." Kane, 942 F. Supp. 2d at 314; see also Mantovani, 2011 WL 1304148, at *5 ("This failure to comply with the regulatory requirements for evaluating Plaintiff's credibility [ ] requires remand.") (citing Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)).

As such, the Court finds that ALJ Cohen committed legal error in his assessment of the Plaintiff's credibility. On remand, the Court directs the ALJ assigned to discuss the seven factors listed in 20 C.F.R. 404.1529(c)(3) while rendering his credibility determination.

### F. As to Whether the ALJ's Selection of July 5, 2007 as the Onset Date was Supported by Substantial Evidence

In addition, the Plaintiff argues that the selection of July 5, 2007 as the onset date was arbitrary and was not supported by substantial evidence. (Pl. Mem., pg. 18.) This date was first selected by ALJ Weiss in the March 26, 2009 decision based on his erroneous belief that this was the first day Dr. Rumore evaluated the Plaintiff and was subsequently adopted by ALJ Cohen in his decision. (AR at 11–17, 69–81.) However, as discussed above, the Appeals Council's June 14, 2011 Remand Order noted that this determination by ALJ Weiss was inaccurate. There is no evidence that suggests the Plaintiff's condition suddenly became disabling on July 5, 2007 but was not disabling prior to that date.

A claimant's alleged onset date of disability may not be rejected solely on account of the lack of medical evidence establishing that precise date.  See Lichter v. Bowen, 814 F.2d 430, 435 (7th Cir. 1987); Maisch v. Hecker, 606 F. Supp. 982, 990–91 (S.D.N.Y. 1985).  Rather, a claimant's onset date of disability is the first date on which she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In determining this date, the ALJ must consider the claimant's allegations of onset of disability, work history, and medical or other evidence, including the testimony of lay witnesses.  See Arroyo v. Callahan, 973 F. Supp. 397, 399 (S.D.N.Y. 1997).

SSR 83-20, which is binding on the ALJ, see Telfair v. Astrue, No. 04 Civ. 2122, 2007 WL 1522616, at *4 (S.D.N.Y. May 15, 2007) (citing Heckler v. Edwards, 465 U.S. 870, 873 n.3, 104 S. Ct. 1532, 79 L. Ed. 2d 878 (1984)), specifically addresses the onset of disabilities of non-traumatic origin:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began[.]

SSR 83-20, 1983 WL 31249 (January 1, 1983).  "In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.

When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy." Id.

SSR 83-20 further provides that "available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in [substantial gainful activity] (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected." Id.

Generally, the alleged date of onset must be accepted if it is consistent with all available evidence. See Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 304 (6th Cir. 1988) ("[SSR 83-20] demands that the claimant's claimed onset date be adopted if it is consistent with all the evidence available."); Lichter, 814 F.2d at 434–36 (vacating the ALJ's decision rejecting [the] plaintiff's alleged onset date because that date was "not clearly inconsistent with the other available evidence"). SSR 83-20 specifically states that "[i]n some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working." SSR 83-20, 1983 WL 31249 (January 1, 1983).

The Plaintiff alleges she was disabled as of January 8, 2004, the time she stopped working. (Pl. Mem., pg. 20–21.) The Court finds that this assertion is consistent with the available evidence.

In this regard, the Plaintiff testified that the combination of fatigue, general pain all over and joint pain, especially in her hands, became untenable for a work situation. (AR at 319.)

When asked why she ceased working, the Plaintiff testified that she began to have pain in her joints, especially in her hands, and fatigue, which led her to reduce her hours on multiple occasions. (AR at 318.) She further testified that "[t]hen I was down to, like, two days a week. And it was just – I couldn't – I'd have a good day. I'd have a bad day. And I just never knew what would be the good day and what would be the bad day. And he, he really – he worked with me, but he really needed somebody more[.]" (AR at 318–19.) In addition, she asserted that she could not sit or stand for long and could only lift ten pounds, and she reported pain in her hands, aching joints and waking up throughout the night due to pain. (AR at 133, 319–20.)

The Plaintiff's testimony is consistent with Dr. Rumore's opinion. Dr. Rumore noted that the Plaintiff began treatment at Rheumatology Associates in July of 2003; had suffered from "extreme fatigue and malaise" and "easy fatigability"; and had "stopped working because of her symptoms in 2004." (AR at 88.) He also noted the same limitations with regards to sitting, standing and lifting ten pounds. (AR at 263–64, 283–84.)

Therefore, the Court directs the ALJ on remand to be mindful of the opinion of Dr. Rumore; the Plaintiff's work history; and the slowly progressive nature of the Plaintiff's fibromyalgia condition in determining whether or not it is reasonable to infer that the Plaintiff was disabled as of on January 8, 2004, when she stopped working. See SSR 83-20, 1983 WL 31249 (January 1, 1983).

**G. As to Whether the Court Should Remand for an Award of Benefits**

Lastly, on the basis that the ALJ "plainly erred as a matter of law when he determined that Mrs. Cabibi was not disabled as alleged, on January 8, 2004," the Plaintiff urges the Court to consider (1) remanding with instructions to award benefits under the fourth sentence of 42 U.S.C. § 405(g); or in the alternative, (2) remanding with instructions to: (a) "fully address the

opinion of Dr. Rumore as directed by the Appeals Council"; (b) "find that [the Plaintiff] met her burden of establishing that her fibromyalgia is a severe impairment and evaluate the severity of this impairment in compliance with SSR 12-2p"; (c) "reassess the onset date of her disability, fully addressing the lay evidence of onset as well as the retrospective opinions of record, in compliance with SSR 83-20"; (d) "reassess her subjective symptoms and credibility"; and (e) "issue a new decision based on substantial evidence and proper legal standards." (Pl. Mem., pg. 24–25.)

As to the first suggested approach, the Plaintiff asserts that this court should exercise its "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, because the Court finds that ALJ Cohen applied incorrect legal standards in reaching his decision, the Court will remand this matter for further consideration, rather than reverse the decision in its entirety. Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000) ("Upon a finding that an administrative record is incomplete or that an ALJ has applied an improper legal standard, we generally vacate and instruct the district court to remand the matter to the Commissioner for further consideration.").

As such, the Court denies the Plaintiff's motion to the extent the Plaintiff seeks an order from this Court directing a finding of disability and remand for an award of benefits at this time. See Maldonado, 2014 WL 537564, at *18 ("Remand solely for the calculation of benefits is not warranted in this case. A remand for calculation of benefits is appropriate only when application of the correct legal standard 'could lead to but one conclusion.'") (quoting Gonzalez v. Astrue, No. 04-CV-3437 (JG), 2008 WL 755518, at *9 (E.D.N.Y. Mar. 20, 2008)).

With respect to the Plaintiff's alternative request, the Plaintiff contends that the court should remand this case with instructions. On the grounds that the ALJ (1) failed to comply with the Appeal Council's June 14, 2011 Remand Order; (2) misconstrued the applicable legal standard at step two; (3) failed to properly assess Dr. Rumore's opinion under the treating physician rule; (4) failed to properly consider the credibility of the Plaintiff; and (5) did not comply with several SSRs, including 12-2p and 83-20, the Court finds that remand is warranted so that an ALJ can issue a new decision based on substantial evidence and proper legal standards. See Green-Younger, 335 F.3d at 108 (remanding the case to the district court with instructions to remand to the Commissioner after holding that "the ALJ's decision that [the plaintiff] [was] not legally disabled [was] based on an erroneous legal standard and [was] not supported by substantial evidence"); Sarchet, 78 F.3d at 309 ("When the decision of that tribunal on matters of fact is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless.").

### III. CONCLUSIONS

For the foregoing reasons, it is hereby:

**ORDERED**, that the Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is denied; and it is further

**ORDERED**, that the Plaintiff's cross-motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is granted in part and denied in part; and it is further

**ORDERED**, that this case is remanded to the ALJ for another hearing consistent with this Memorandum of Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
      August 28, 2014

                                                _____*/s/ Arthur D. Spatt*_____
                                                 ARTHUR D. SPATT
                                     United States District Judge